**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BAHADIR YAHSI,<br><br>       Defendant | Crim. Action No. 11-353 (JLL)<br><br>**OPINION** |

**LINARES,** District Judge**.**

      This matter comes before the Court by way of Defendant Bahadir Yahsi's ("Yahsi" or "Defendant")'s motion for judgment of acquittal notwithstanding the verdict pursuant to Fed. R. Crim. P. 29, or in the alternative, a new trial pursuant to Fed. R. Crim. P. 33.  The Court has considered the arguments made on the record on December 10, 2012, as well as the submissions in support of and in opposition to Defendant's motion.  For the reasons set forth below, Defendant's motion is denied.

**I.     BACKGROUND**

      On January 23, 2012, a federal grand jury returned a five-count second superseding indictment charging Yahsi with (1) conspiracy to distribute and to possess with intent to distribute oxycodone, a Schedule II controlled substance, and 3, 4-methylenedioxymethamphetamine ("MDMA" or "ecstasy"), a Schedule I controlled substance; (2) distribution of, and possession with intent to distribute oxycodone on September 30, 2010; (3) distribution of, and possession with intent to distribute MDMA on August 15, 2010; (4)

distribution of, and possession with intent to distribute MDMA on August 19, 2010, and (5) distribution of, and possession with intent to distribute MDMA on August 25, 2010.

Yahsi moved to dismiss the second superseding indictment on February 27, 2012 based on an alleged violation of the Double Jeopardy Clause.  (*See* CM/ECF No. 50.)  The Court denied this motion.  (*See* CM/ECF No. 73.)  On April 3, 2012, Yahsi filed a notice of interlocutory appeal, and this Court stayed proceedings pending the resolution of Yahsi's appeal to the Third Circuit.  (CM/ECF No. 83.)

The Third Circuit affirmed this Court's denial of Yahsi's motion to dismiss on Double Jeopardy grounds on July 27, 2012.  (*See* CM/ECF Nos. 85, 87.)  Subsequently, this Court scheduled the matter for trial to commence on December 3, 2012.

On December 4, 2012, a jury was empaneled.  Between December 4 and December 7, 2012, the Government presented its case-in-chief to the jury.  Upon the conclusion of the Government's case-in-chief, Yahsi moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 based on the following grounds: (1) that the Government did not present sufficient evidence to prove each and every element of the offenses charged, and (2) that Yahsi's Sixth Amendment confrontation rights were violated because the individual who calibrated the equipment that Drug Enforcement Agency ("DEA") chemist Brian Hall ("Hall") used to test the drugs recovered in this case did not testify at trial.  Yahsi also requested that this Court take judicial notice of his incarceration between April 6 and April 26, 2010, arguing that his detention during this period was relevant to establish that he was lying when he took credit for supplying an oxycodone sample to a coconspirator in April 2010.

On December 10, 2012, this Court denied Defendant's Rule 29 motion, but granted his request that the Court take judicial notice of his incarceration between April 6 and April 26,

2010.  The Court read a factual statement to the jury explaining that it was taking judicial notice

of Defendant's incarceration between April 6 and April 26, 2010.  Yahsi then rested his case, and

renewed his motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29, raising additional

grounds for relief.  The Court heard arguments from both the defense and the Government, and

reserved its decision until after the jury's verdict.

On the morning of December 11, 2012, the jury began deliberating.  Later that morning,

the jury returned a verdict convicting Yahsi of all five counts charged in the second superseding

indictment.  Yahsi was then remanded into the custody of the U.S. Marshals upon the

Government's motion.

On December 21, 2012, Yahsi filed the instant motion.

## II.     LEGAL STANDARD

### A.  Federal Rule of Criminal Procedure 29

To prevail on a Rule 29 motion for judgment of acquittal, the defendant "bears the very

heavy burden of showing that, viewing the evidence in the light most favorable to the

Government, no rational trier of fact could find him guilty beyond a reasonable doubt."  *United

States v. Johnson*, 302 F.3d 139, 149 (3d Cir. 2002).  This Court must draw all reasonable

inferences in favor of the Government in resolving Yahsi's Rule 29 motion.  *See id.*

### B.  Federal Rule of Criminal Procedure 33

A district court should vacate a judgment of conviction and order a new trial pursuant to

Federal Rule of Criminal Procedure 33 if "there is a serious danger that a miscarriage of justice

has occurred – that is, that an innocent person has been convicted."  *United States v. Brennan*,

326 F.3d 176, 189 (3d Cir. 2003).  Rule 33 motions should be "granted sparingly and only in

exceptional cases."  *United States v. Silveus*, 542 F.3d 993, 1004 (3d Cir. 2008).  In considering a

3

Rule 33 motion, courts should not consider evidence in the light most favorable to the

Government.  "[R]ather, on a Rule 33 motion, the court exercises its own judgment in assessing

the government's case" to determine whether a judgment of conviction constitutes a manifest

injustice in light of the evidence admitted at trial.  *See United States v. Johnson*, 302 F.3d 139,

150 (3d Cir. 2002); *see also Brennan*, 326 F.3d at 189.

## III.    DISCUSSION

In his motion, Yahsi argues that this Court should enter a judgment of acquittal or order a

new trial based on the following grounds: (1) that the Government's failure to call the calibrator

of the equipment that DEA chemist Hall used to test various drug samples amounts to a violation

of Yahsi's Sixth Amendment confrontation rights; (2) that the Government failed to introduce

sufficient evidence to establish the identity of the controlled substances at issue in this case; (3)

that the Court improperly admitted Yahsi and his coconspirator Ilkay Guner ("Guner")'s false

statements concerning the distribution of an oxycodone sample in April 2010; and (4) that the

Court's failure to enter a judgment of acquittal as to the conspiracy count, or order a new trial,

would amount to a violation of the Fifth Amendment's Double Jeopardy Clause.

The Court will now proceed to address each of Yahsi's asserted bases for moving for a

judgment of acquittal or a new trial.

### A.    Confrontation Clause

The Sixth Amendment guarantees that "in all criminal prosecutions, the accused shall

enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST. Amend. VI.

Yahsi argues that "the Government circumvented the requirements of the Confrontation

Clause by allowing Hall to testify that the laboratory equipment he used to conduct his chemical

analyses had been properly calibrated," despite the fact that Hall did not perform the calibrations

himself.  (*See* Def. Br. at 4.)  Yahsi made this same argument in his initial Rule 29 motion.

Indeed, Yahsi cites the very same authorities he cited in his initial Rule 29 motion – *Crawford v.*

*Washington*, 541 U.S. 36 (2004), *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011), and *United*

*States v. Ramos-Gonzalez*, 664 F.3d 1 (1st Cir. 2011).  Yahsi has also cited *Melendez-Diaz v.*

*Massachusetts*, 557 U.S. 305 (2009), a case which this Court considered in ruling on Yahsi's

initial Rule 29 motion even though Yahsi had not cited that case in support of that motion.

In *Crawford*, the Supreme Court held that the admission into evidence of an absent

witness's testimonial statements violates a criminal defendant's Sixth Amendment confrontation

rights unless the absent witness is unavailable and "the defendant has had a prior opportunity to

cross-examine." *Crawford*, 541 U.S. at 59.  Testimonial statements are those that "have a

'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal

prosecution." *Bullcoming*, 131 S. Ct. at 2714 n.6 (alteration in original, citation omitted).  Put

another way, statements "made under circumstances which would lead an objective witness

reasonably to believe that the statement would be available for use at a later trial" are

testimonial.  *See Crawford*, 541 U.S. at 52; *see also Melendez-Diaz v. Massachusetts*, 557 U.S.

at 311.

In each of the cases upon which Yahsi relies to support his Confrontation Clause

argument, the court held that a criminal defendant's confrontation rights had been violated

because the out-of-court testimonial statement of a non-testifying declarant had been admitted.

*See Crawford*, 541 U.S. at 68 (admission of out-of-court testimonial statement to police held to

be in violation of Confrontation Clause); *Bullcoming*, 131 S. Ct. at 2717 (admission of lab report

concluding that defendant's blood alcohol content was above the legal driving limit, without the

live testimony of the analyst who prepared said report, amounted to Confrontation Clause

violation); *Melendez-Diaz*, 557 U.S. at 311 (admission of analyst reports certifying that substance seized from defendant was cocaine amounted to Confrontation Clause violation because analyst who prepared said reports did not testify at trial); *Ramos-Gonzalez*, 664 F.3d at 6 (holding that Confrontation Clause was violated when district court allowed chemist to testify about results of drug analysis he did not conduct).

As this Court stated in its Opinion and Order denying Yahsi's initial Rule 29 motion, the instant case is distinguishable from each of the cases upon which Yahsi has relied.  Unlike in those cases, no out-of-court testimonial statement of a non-testifying declarant was admitted into evidence in this case.  Specifically, no testimonial statements of the individuals who calibrated the equipment that Hall used were admitted.  Indeed, the calibration of the equipment used to test the drug samples is not a **testimonial statement**, but a routine act that, as Hall testified, is performed on a monthly basis.  (*See* Tr. 5.75:4-6.)  Yahsi has failed to cite any authority, or set forth any reasons as to why this Court should conclude that the calibration of the equipment that Hall used amounts to a testimonial statement.  Instead, Yahsi asserts that it is critical that "the defense be allowed to inquire into the validity of tests conducted and procedures followed."  Yahsi had the opportunity to do this in closing argument, and while cross-examining Hall.

Unlike the defendants in *Bullcoming*, *Ramos-Gonzalez*, and *Melendez-Diaz*, Yahsi also had the opportunity to confront and cross-examine the individual who performed the lab tests and authored the reports memorializing the results of said tests.  The fact that the individuals who calibrated the equipment did not testify at trial simply does not amount to a violation of Yahsi's Sixth Amendment rights because these individuals did not make any testimonial statements that were introduced into evidence.

B.      Sufficiency of Evidence to Establish the Identity of the Controlled Substances

6

Yahsi argues that there was insufficient evidence to prove the identity of the controlled substances at issue in this case because the lab reports confirming the identity of said substances were not admitted into evidence.  This argument is without merit.

It is well settled that the Government may prove the identity of a controlled substance through circumstantial evidence.  *See Griffin v. Spratt*, 969 F.2d 16, 22 n.2 (3d Cir. 1992) ("The prosecution may establish the identity of a drug through cumulative evidence.  So long as the government produces sufficient evidence, direct or circumstantial, from which the jury is able to identify the substance beyond a reasonable doubt, the lack of scientific evidence is not objectionable.") (internal quotation marks and citations omitted).  "Such evidence can include lay experience based on familiarity through prior use, trading, or law enforcement; a high sales price; on-the-scene remarks by a conspirator identifying the substance as a drug; and behavior characteristic of sales and use such as testing, weighing, cutting and peculiar ingestion."  *See United States v. Rivera*, 413 Fed. App'x. 470, 476 (3d Cir. 2011) (citing *United States v. Harrell*, 737 F.2d 971, 978 (11th Cir. 1984)); *see also United States v. Schrock*, 855 F.2d 327, 334 (6th Cir. 1988) ("To our knowledge, no court has held that scientific identification of a substance is an absolute prerequisite to conviction for a drug-related offense, and we too are unwilling to announce such a rule.").

In this case, Hall's testimony provided sufficient evidence to support a finding beyond a reasonable doubt that the substances which Yahsi distributed were, in fact, oxycodone and MDMA.  Hall explained in painstaking detail the procedures he used to test the substances the Government recovered on the dates of the drug transactions at issue in this case. (*See* Tr. 5.64-5.66; 5.68:6-25; 5.69:1-6.)  After explaining how he went about testing the substances, Hall testified that in his expert opinion, Exhibit 303 contained oxycodone hydrochloride, and Exhibits

7

300, 301, and 302 contained MDMA.[1]  (Tr. 5.67:2-25; 5.68:1.)  To the extent that Yahsi believed

that Hall's testing methodology was flawed, he was free to attempt to expose those flaws during

cross-examination and closing argument.  Indeed, during cross-examination, Hall acknowledged

that he did not know the purity of any of the substances he tested.  (Tr. 5.74:4-21.)  The jury was

entitled to weigh this fact in considering whether to find Hall's results reliable.  Based on the

ultimate verdict, however, Hall's testimony persuaded the jury that the substances recovered by

the Government were, in fact, oxycodone and MDMA.  This Court sees no basis to disturb the

jury's factual findings with respect to the identity of the substances the Government recovered

because these findings are reasonable in light of the evidence presented at trial.

      C.     <u>Yahsi and Guner's Statements Concerning the Distribution of an Oxycodone
          Sample in April 2010</u>

Over Yahsi's objection, the Court allowed Government witness Mile (also known as

Miles) Petkovski to testify that in June 2010, Ilkay Guner (also known as "Mikey" or "Mike")

informed him that a 30-milligram oxycodone sample that he gave to Petkovksi in April 2010 (the

"April 2010 oxycodone sample") was originally obtained from Yahsi.  (Tr. 3.97-3.98.)  The

Court also allowed the admission of an audio recording of an August 2, 2010 conversation

during which Yahsi told Petkovski:

> What Mike gave you that time, I gave it to him, that
> samples.  You know what I mean?  And I told him I needed
> it for, I told your price.  But he didn't tell me who it was for

---

[1] At trial, Yahsi and the Government stipulated that Exhibits 300, 301, 302, and 303 were recovered by the Federal
Bureau of Investigation on August 15, 2010; August 19, 2010; August 25, 2010; and September 30, 2010,
respectively.  (Tr. 5.83-5.84.)  These are the dates of the drug transactions charged in the second superseding
indictment.

[2] Petkovski testified that he understood this statement as confirmation that Yahsi was the source of the oxycodone
sample obtained from Guner.  (Tr. 3.134:22-25 – 3.135:1-2.)

[3] On this basis alone, the Court could have overruled any hearsay objection to the admission of Yahsi and Guner's
challenged statements, as these statements are not even hearsay as that term is defined in Fed. R. Evid. 801(c).  *See*

and I know it wasn't for him.  (*See* Ex. 107, and Recording
Transcript Ex. 107A at 5.)[2]

Yahsi argues that he is entitled to a judgment of acquittal or a new trial because the Court
should neither have allowed Petkovski to testify about Guner's June 2010 statement, nor
admitted Yahsi's statement claiming to be the source of the April 2010 oxycodone sample.
Specifically, Yahsi contends that these statements were inadmissible because they are false.  To
support his claim that these statements are false, Yahsi argues that he could not have given
Guner a 30-milligram oxycodone sample in April 2010 because he was incarcerated at this time,
and points out that reports from the Federal Bureau of Investigation state that the April 2010
oxycodone sample came from a "Tony LNU."  (*See* Def. Br. at 9.)

The Court will now address whether the admissions of (1) Guner's out-of-court
statement, and (2) Yahsi's statement on August 2, 2010 warrant either a judgment of acquittal or
a new trial.

1.    Guner's Out-of-Court Statement

Fed. R. Evid. 801(d)(2)(E) provides that a statement that "is offered against an opposing
party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy"
is not hearsay.  For a court to admit statements "under Rule 801(d)(2)(E), the party seeking to
offer the evidence must demonstrate: '(1) that a conspiracy existed; (2) the declarant and the
party against whom the statement is offered were members of the conspiracy; (3) the statement
was made in the course of the conspiracy; and (4) the statement was made in furtherance of the
conspiracy.'" *See United States v. McGlory,* 968 F.2d 309, 333 (3d Cir. 1992); *United States v.
Fitzgerald*, No. 10-4632, 2012 U.S. App. LEXIS 19231 (3d Cir. Sept. 13, 2012).

---

[2] Petkovski testified that he understood this statement as confirmation that Yahsi was the source of the oxycodone
sample obtained from Guner.  (Tr. 3.134:22-25 – 3.135:1-2.)

Here, the Court is satisfied that as of June 2010—when Guner told Petkovski that Yahsi was the source of the April 2010 oxycodone sample—Guner and Yahsi had formed a conspiracy to distribute drugs to Petkovski.  When Guner made this statement, Petkovski had not yet met Yahsi.  He had merely heard from Guner that there was an individual living in Paterson (i.e., Yahsi) who could provide drugs.  Guner reached out to Yahsi in June 2010 for the specific purpose of distributing drugs to Petkovski.  (*See generally* Tr. 3.97-3.102.)  Guner's statement about which Petkovski testified was made in the course of Guner and Yahsi's conspiracy to distribute drugs to Petkovski.

Additionally, Guner's June 2010 statement to Petkovski was made in furtherance of the drug distribution conspiracy.  Specifically, in telling Petkovski that Yahsi was the source of the April 2010 oxycodone sample, Guner sought to bolster Yahsi's *bona fides* as a reliable source of drugs to persuade Petkovski to engage in future transactions with Yahsi.

Because Guner's June 2010 statement was made in furtherance of his and Yahsi's conspiracy to distribute drugs to Petkovski, the Court properly admitted this statement pursuant to Fed. R. Evid. 801(d)(2)(E).

2.    Yahsi's August 2, 2010 Statement

Fed. R. Evid. 801(d)(2)(A) provides that a "statement [that] is offered against an opposing party and was made by the party in an individual or representative capacity" is not hearsay.

As the audio recording admitted into evidence as Exhibit 107 demonstrates, there is no question that on August 2, 2010, Yahsi took credit for giving Guner the drug sample that Guner, in turn, gave to Petkovski.  Yahsi's statement was admissible as an admission of an opposing party pursuant to Fed. R. Evid. 801(d)(2)(A).

Yahsi's suggestion that his own statement, recorded in Exhibit 107, was inadmissible because it lacked sufficient indicia of reliability is without merit. Both Guner and Yahsi's challenged statements are relevant because they are probative of an agreement between Yahsi and Guner to distribute drugs to Petkovski, and also probative of these individuals' shared efforts to bolster Yahsi's credentials as a reliable supplier of drugs. They are not, however, relevant for the truth of the matter asserted.[3] In other words, even if the challenged statements were lies, they would still be probative of Guner and Yahsi's shared intent to establish the latter as a reliable supplier of drugs for Petkovski.[4]

For these reasons, Yahsi is not entitled to a judgment of acquittal or a new trial on account of this Court's admission of his and Guner's respective statements claiming that Yahsi was the source of the 30-milligram oxycodone sample that Petkovski received in April 2010.

D.    Harmless Error Analysis

In the Third Circuit, "[a]n error in an evidentiary ruling is harmless when it is highly probable that the error did not affect the result." *United States v. Friedman*, 658 F.3d 342, 352 (3d Cir. 2011) (quoting *Hill v. Laeisz*, 435 F.3d 404, 420 (3d Cir. 2006)). Even assuming, *arguendo*, that this Court had erred in admitting Yahsi and Guner's respective statements, the Court would nonetheless decline to grant a judgment of acquittal or a new trial because such an error would have been harmless. As the examples provided below illustrate, there was a plethora

---

[3] On this basis alone, the Court could have overruled any hearsay objection to the admission of Yahsi and Guner's challenged statements, as these statements are not even hearsay as that term is defined in Fed. R. Evid. 801(c). *See* Fed. R. Evid. 801(c) (defining hearsay as a "statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.").

[4] For this reason, the Court finds Yahsi's suggestion that the Government "knowingly presented false testimony" to be without merit. In its rebuttal argument, the Government, itself, acknowledged the possibility that Yahsi may have lied about providing the April 2010 oxycodone sample to Guner. (Tr. 6.165:9-14.) It bears mentioning that none of the reasons that Yahsi advances as to why it would have been impossible for him to have supplied the 30-milligram oxycodone sample that Petkovski obtained in April 2010 negate the possibility that he may have been the source of the sample. In any event, whether or not Yahsi provided the April 2010 oxycodone sample to Guner is irrelevant to the issue of the admissibility of Guner and Yahsi's challenged statements.

of other evidence that was sufficient to support a finding of guilt beyond a reasonable doubt on

the conspiracy and each of the distribution charges in the second superseding indictment.[5]

1. Count 1 - Conspiracy to Distribute Oxycodone and MDMA

"A drug distribution conspiracy requires: '(1) a shared unity of purpose; (2) an intent to

achieve a common goal; and (3) an agreement to work together toward the goal." *United States*

*v. Nguyen*, 344 Fed. Appx. 821, 824 (3d Cir. 2009) (quoting *United States v. Iglesias,* 535 F.3d

150, 156 (3d Cir. 2008)).  The following illustrative examples would suffice to support a

conviction on Count 1 beyond a reasonable doubt:

(a) Evidence of a Conspiracy with Guner

The following testimony of Mile Petkovski suffices to support a finding beyond a

reasonable doubt that Yahsi conspired with Guner to distribute drugs to Petkovksi:

| QUESTION: | Now, you testified that Mikey took you to meet with the defendant.  Is that correct? |
|---|---|
| PETKOVSKI: | Yes. |
| QUESTION: | Was that the first time you met with the defendant? |
| PETKOVSKI: | Yes. |
| QUESTION: | And what month and year did you first meet with the defendant? |
| PETKOVSKI: | I first met him towards the end of June or the end of June at 2010 at his auto body shop in Paterson. |

---

[5] The evidence discussed in this section is not intended to be an exhaustive account of all the evidence that supports a finding of Yahsi's guilt beyond a reasonable doubt.  Instead, the Court has endeavored merely to illustrate, by way of example, why even if it erred in admitting the challenged statements of Yahsi and Guner, the erroneous admission of this evidence would not have changed the outcome at trial.

| QUESTION: | Was Mikey present when you first met the defendant? |
| --- | --- |
| PETKOVSKI: | Yes, he was present. |
| QUESTION: | What is your understanding of why Mikey was introducing you to the defendant. |
| PETKOVSKI: | To directly negotiate and discuss with him the buying of the drugs. |
| QUESTION: | Did you have discussions with Mikey and the defendant about drugs during the first meeting with the defendant present? |
| PETKOVSKI: | Yes.  We did discuss drugs and other things as well. |
| QUESTION: | What type of drugs? |
| PETKOVSKI: | We discussed the Oxycontin, 30-milligram drug. |

(Tr 3.102-3.103.)

(b) <u>Conspiracy with Ersin Eroglu to Distribute 80-milligram Oxycodone Pills</u>

The testimony of Ersin Eroglu and the video recording admitted into evidence as Exhibit 106 suffice to support a finding beyond a reasonable doubt that Yahsi conspired with Eroglu to distribute 100 80-milligram pills of oxycodone on September 30, 2010.

Eroglu testified that on September 30, 2010, he met with Yahsi and Petkovski to carry out a transaction involving the sale of 100 80-milligram oxycodone pills.  Specifically, Eroglu testified that he gave the pills "to Bahadir Yahsi, and then Miles [Petkovski] turned around and handed [him] the money."  (Tr. 5.133.)  Eroglu further testified that he counted only $2,000 of the $3,000 he was supposed to receive for the oxycodone pills after Yahsi reassured him that the money was "straight," that is, that it was all there.  (Tr. 5.133-5.134.)

13

Eroglu's testimony is corroborated by the video and audio recording admitted into evidence as Exhibit 106.  This recording shows Yahsi, Eroglu, and Mile Petkovski present during the drug transaction.  In Clip 5 of Exhibit 106, the following exchange is heard:

| | |
|---|---|
| **PETKOVSKI:** | Okay, count the money and go. |
| **EROGLU:** | Okay |
| **DEFENDANT:** | Ersin, the money's straight my ["n" word] it's straight. |
| **EROGLU:** | Yea? |
| **PETKOVSKI:** | Don't worry. |
| **DEFENDANT:** | Yeah, it's straight, go ahead. |
| **EROGLU:** | Well I have to count it bro, I have to. |
| **DEFENDANT:** | No it's straight!  I'm telling you it's straight! |
| **PETKOVSKI:** | Okay, we're counting, we're counting.  Fast. |
| **DEFENDANT:** | Ersin you're my cousin for twenty years, but you don't ["F"ing] trust me? |
| **EROGLU:** | No, no, it's not my, my ["N" word]. |
| **DEFENDANT:** | I'm telling you straight, that's my man, dog. |
| **EROGLU:** | Alright dog, I'm not even going to count the other thousand.  I trust you man. |

(*See* Ex. 106A at 17-18.)

(c) Conspiracy with suppliers to distribute MDMA

14

At numerous points in the recordings admitted into evidence, Yahsi makes reference to his ecstasy suppliers.  Yahsi's statements in these recordings suffice to support a finding beyond a reasonable doubt that Yahsi conspired with his suppliers to distribute MDMA to Petkovski.  By way of example, in the audio recording admitted into evidence as Exhibit 103, Yahsi is heard telling Petkovski on August 19, 2010 that he will receive various MDMA samples from his supplier on the following day:

> **DEFENDANT:** Tomorrow he says he's got the, he's gonna have the red hearts and the, the lady Gs.  The blue ones.  So that's four different kinds.  That out here.  You got to let me know, you know.  (Ex. 103A, Clip 1, at 2.)[6]

2.  Counts 2-5 – Distribution of, and Possession with Intent to Distribute Oxycodone and MDMA

There is sufficient evidence to support a finding beyond a reasonable doubt that Yahsi possessed the oxycodone and ecstasy drugs at issue in this case with the intent to distribute them.  Based on the following excerpt of Petkovski's testimony, for instance, a reasonable jury may conclude beyond a reasonable doubt that Yahsi's intent in obtaining oxycodone and MDMA for Petkovski was so that Petkovski could, in turn, redistribute these drugs to his "cousin."

> **QUESTION:** Did you and the defendant have an understanding as to who would be buying these pills from you?
>
> **PETKOVSKI:** I always told him that my cousin would be buying the drugs from us.
>
> **QUESTION:** So you and the defendant were going to sell these drugs to you said a cousin or –

---

[6] Petkovski testified that "blue ones" referred to 30-milligram oxycodone, (*see* Tr. 3.165:20-22), and that "lady g's" and "red hearts" referred to ecstasy.  (*See* Tr. 3.158:7-10; 3.156:18-20.)

15

| | |
|---|---|
| **PETKOVSKI:** | He thought the drug was going to my cousin, but as a matter of fact, the drugs went to FBI agents. |

(Tr. 3.126).

With respect to distribution, there is sufficient evidence to support a finding beyond a reasonable doubt that Yahsi distributed a supply of 80-milligram oxycodone pills to Petkovski on September 30, 2010 as charged in Count 2, and distributed samples of MDMA to Petkovski on August 15, August 19, and August 25, 2010 as charged in Counts 3, 4 and 5, respectively.

Indeed, the Third Circuit has adopted a broad interpretation of the term "distribute." *See United States v. Pungitore*, 910 F.2d 1084, 1133 (3d Cir. 1990) ("Courts have broadly construed the term, 'distribute,' as encompassing any acts perpetrated in furtherance of a transfer or sale, such as arranging or supervising the delivery, or negotiating for or receiving the purchase price" of a controlled substance).  The evidence discussed below supports a finding beyond a reasonable doubt that Yahsi distributed drugs on each of the dates charged in the second superseding indictment.

a.  Count 2 (September 30, 2010 Oxycodone Transaction)

Ersin Eroglu's testimony concerning the September 30, 2010 oxycodone transaction provides just one example of evidence that suffices to support a finding beyond a reasonable doubt that Yahsi distributed oxycodone as charged in Count 2 of the second superseding indictment:

| | |
|---|---|
| **QUESTION:** | What did you do with the oxycodone pills at that point? |
| **EROGLU:** | I handed them over to Bahadir Yahsi, and then Miles turned around and handed me the money. |
| **QUESTION:** | Let's talk about you handing the pills to Bahadir Yahsi.  Why did you hand |

16

> the pills to Bahadir rather than the
> customer, Miles?

**EROGLU:**   As I said before I didn't know Miles.

**QUESTION:**   What did defendant Yahsi do with
the bag containing the oxycodone
pills, as best you could tell?

**EROGLU:**   He gave them to Mr. Miles.

(Tr. 5.133.)

### b.  Count 3 (August 15, 2010 MDMA Transaction)

The testimony of Mile Petkovski provides sufficient evidence to support a finding beyond

a reasonable doubt that Yahsi distributed MDMA on August 15, 2010 as charged in Count 3 of

the second superseding indictment.  Specifically, according to Petkovski, August 15, 2010 was

> the first time that [he] got the first sample of the drug
> ecstasy.  That is the drug called purple lips.  And the
> defendant told [him] that in [their] next meeting he [Yahsi]
> would give [him] three other kinds of ecstasy drugs.

(Tr. 3.145; *see also* Ex. 102).

### c.  Count 4 (August 19, 2010 MDMA Transaction)

The testimony of Mile Petkovski and the audio recording admitted into evidence as

Exhibit 103, suffice to support a finding beyond a reasonable doubt that Yahsi distributed

MDMA to Petkovski on August 19, 2010.  Specifically, Petkovski testified that on August 19,

2010, he met Yahsi in Paterson where Yahsi gave him a drug sample "called Blue Star," which

"is another kind of ecstasy drug."  (Tr. 3.152:17-19.)  In Clip 1 of the audio recording admitted

into evidence as Exhibit 103, Yahsi is heard telling Petkovski, "Listen, take these, the stars.

Okay?"  Petkovski explained that when Yahsi told him this, he was "handing [him] the Blue Star

sample drug."  (Tr. 3.152:22-23.)

17

d.  Count 5 (August 25, 2010 MDMA Transaction)

The testimony of Mile Petkovski suffices to support a finding beyond a reasonable doubt

that Yahsi distributed MDMA to Petkovski on August 25, 2010.  Specifically, Petkovski testified

as follows with respect to his August 25, 2010 meeting with Yahsi:

> When we meet, me and the defendant, he gave me samples of the
> drugs called Red Hearts.  That is also a sample of the ecstasy drug.
> He gave me two pills.

(Tr. 3.156).

Indeed, as these examples illustrate, there is sufficient evidence, independent of Yahsi

and Guner's challenged statements, to support the jury's conviction of Yahsi.  Accordingly, any

error this Court may have committed in admitting these statements would amount to harmless

error, as there is no reasonable probability that the exclusion of these statements would have

changed the trial's outcome.

E.     Double Jeopardy

In renewing his motion for a judgment of acquittal based on double jeopardy grounds – a

motion which this Court previously denied, and which denial the Third Circuit affirmed on July

27, 2012 – Yahsi asserts that he is entitled to a judgment of acquittal on Count 1 of the second

superseding indictment because "a temporal overlap has now been proven as to the state and

federal conspiracies."  (Def. Br. at 18.)  According to Yahsi, this temporal overlap exists because

the Government's suggestion that Yahsi may have provided the oxycodone sample that Guner

gave to Petkovski prior to being incarcerated in April 2010 "pushed the timing of the putative

transaction into the time of the state conspiracy charged against Yahsi, for which he was arrested

on April 6, 2010."  (Def. Br. at 18.)

18

Yahsi's renewed double jeopardy claim is untenable for two reasons (1) as a separate sovereign, the Federal Government was entitled to prosecute Yahsi for offenses arising out of the same events that gave rise to the state prosecution, and (2) as the Third Circuit observed, "there is no significant overlap" between the acts underlying the state and federal offenses for Yahsi "to establish his *prima facie* burden of double jeopardy." *See United States v. Yahsi*, No. 12-1928, 2012 U.S. App. LEXIS 15537, at *5 (3d Cir. July 27, 2012).

      a.  <u>Dual Sovereignty</u>

The Double Jeopardy Clause of the Fifth Amendment guarantees that no person "shall be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. Amend. V. "[A]n act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each." *United States v. Lanza*, 260 U.S. 377, 382 (1922) (stating that the Fifth Amendment forbids "a second prosecution under authority of the Federal Government after a first trial for the same offense under the same authority."). That is, "when the same act transgresses the laws of two sovereigns, 'it cannot be truly averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences, for each of which he is justly punishable." *Heath v. Alabama*, 474 U.S. 82, 88 (1985) (quoting *Moore v. Illinois*, 14 How. (55 U.S.) 13, 20 (1852)); *see also United States v. Piekarsky*, 687 F.3d 134, 149 (3d Cir. 2012) ("[U]nder the doctrine of Dual Sovereignty, a state prosecution does not bar a subsequent federal prosecution for the same conduct."). "The crucial determination [of] whether the two entities that seek successively to prosecute a defendant for the same course of conduct can be termed dual sovereigns . . . turns on whether the two entities draw their authority to punish the offender from distinct sources of power." *Heath*, 474 U.S. at 88.

19

In this case, the State of New Jersey charged Yahsi in 2010 with conspiracy to distribute oxycodone in violation of N.J.S. 2C:5-2 and N.J.S. 2C:35-10.5(a)(4), and conspiracy to distribute MDMA in violation of N.J.S. 2C:5-2 and N.J.S. 2C:35-5(a)(1).  (*See* CM/ECF No. 50-5.)  In 2012, the Federal Government charged Yahsi with conspiracy to distribute oxycodone and MDMA in violation of 21 U.S.C. § 841(a), 21 U.S.C. § 841(b)(1)(C), and 21 U.S.C. § 846.  (*See* CM/ECF No. 46.)  Because the sources of law upon which the State of New Jersey and the Federal Government based their respective prosecutions of Yahsi are distinct, it is clear to this Court that no double jeopardy violation exists as a result of each of these sovereign's prosecution of Yahsi.[7]

### b.  Overlap Between Acts Underlying State and Federal Offenses

Even assuming, *arguendo*, that the State of New Jersey and the Federal Government were not entitled separately to prosecute Yahsi for the same acts, the Court would still reject Yahsi's double jeopardy argument.  A conspiracy defendant will make a non-frivolous showing of double jeopardy upon a showing that, based on the totality of the circumstances, "(a) the 'locus criminis' of the two alleged conspiracies is the same; (b) there is a significant degree of temporal overlap between the two conspiracies charged; (c) there is an overlap of personnel between the two conspiracies (including unindicted as well as indicted coconspirators); and (d) the overt acts charged and the role played by the defendant according to the two indictments are similar." *United States v. Liotard*, 817 F.2d 1074, 1078 (3d Cir. 1987) (citations omitted).

---

[7] In *Bartkus v. Illinois*, 359 U.S. 121 (1959), the Supreme Court suggested a potential exception to the Dual Sovereignty Doctrine.  In that case, the Supreme Court stated "that dual federal and state prosecutions might run afoul of the general rule affirming such prosecutions if one authority was acting as a surrogate for the other, or if the state prosecution was merely a sham and a cover for a federal prosecution." *United States v. Berry*, 164 F.3d 844, 846 (3d Cir. 1999) (quoting *Bartkus*, 359 U.S. at 123-24).  Here, there is nothing to suggest that the Government acted as a surrogate for the State of New Jersey in prosecuting Yahsi.  Thus, any exception to the Dual Sovereignty rule that may exist is inapplicable to this case.

The only substantive difference between Yahsi's previous double jeopardy argument, which both this Court and the Third Circuit rejected, and the one he raises now, is his claim that references to the April 2010 oxycodone transaction during trial create a temporal overlap between the state and federal conspiracy charges.  Accordingly, the Court will address only this new aspect of Yahsi's argument.

The April 2010 oxycodone transaction did not form a basis for any of the offenses charged in the second superseding indictment.  Indeed, the second superseding indictment neither charges Yahsi with conspiracy to distribute oxycodone in April 2010, nor with distributing oxycodone at this time.  As discussed *supra*, the references at trial to the April 2010 oxycodone transaction arose within the context of Yahsi and Guner's statements made in August and June 2010, respectively.  These statements, which reference the April 2010 oxycodone transaction and were made during the scope of the charged conspiracy, are probative of Yahsi's participation in that conspiracy.  They do not, however, create a temporal overlap between conspiracies charged in the state and federal cases.  Thus, for this reason, as well as for the reasons the Third Circuit stated in affirming this Court's previous rejection of Yahsi's double jeopardy argument, Yahsi cannot satisfy a *prima facie* showing of double jeopardy under *Liotard*.

IV.    **CONCLUSION**

For the foregoing reasons, Yahsi's motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 or a new trial pursuant to Fed. R. Crim. P. 33 is denied.  An appropriate order follows this Opinion.

Date: February 11, 2013

/s/ Jose L. Linares
Jose L. Linares
United States District Judge

21